**COURT OF APPEALS
DECISION
DATED AND FILED**

**July 25, 2024**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP985**

**STATE OF WISCONSIN**

Cir. Ct. No. 2023TP1

**IN COURT OF APPEALS
DISTRICT IV**

IN RE THE TERMINATION OF PARENTAL RIGHTS TO R.B.,
A PERSON UNDER THE AGE OF 18:

DANE COUNTY,

    PETITIONER-RESPONDENT,

  V.

J.B.,

    RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Dane County: EVERETT D. MITCHELL, Judge. *Affirmed*.

¶1 NASHOLD, J.[1] J.B. appeals an order terminating her parental rights to her biological son, R.B. She argues that the circuit court erroneously exercised its discretion in determining that termination was in R.B.'s best interests. I reject J.B.'s argument and affirm.

## BACKGROUND

¶2 J.B. is the biological mother of R.B., born in 2015. In 2019, a child in need of protection or services ("CHIPS") action was filed on behalf of R.B. based on allegations that J.B. had neglected or abused R.B. on multiple occasions. The CHIPS petition alleged, among other things, the following: J.B. had been named as the alleged maltreater in fourteen child protective services reports relating to R.B., these "reports indicated a pattern of angry and violent outbursts" toward R.B. and others, and J.B. herself had reported thoughts of harming R.B.[2] R.B. was ultimately placed outside of J.B.'s home by a CHIPS dispositional order setting conditions that J.B. was required to meet before R.B. could be returned to her care.

¶3 In January 2023, the County filed a petition commencing this involuntary termination of parental rights ("TPR") action against J.B. As grounds

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version.

[2] This description of the allegations in the CHIPS petition is taken from a summary of the petition later filed with the circuit court, because the CHIPS petition itself is not in the record on appeal. Indeed, it appears that no documents from the underlying CHIPS action were made part of the record in this termination of parental rights action. Rather, in its filings before the circuit court in this action, the County referred to docket entries in the underlying CHIPS action without attaching the referenced documents themselves. I note that this practice may complicate appellate review, because appellate courts do not have ready access to circuit court docket entries that have not been made part of the record on appeal. However, in this appeal, the documents in the CHIPS action are not directly pertinent to any issue raised.

for termination, the County alleged that J.B. had failed to meet return conditions and R.B. was in continuing need of protection or services.[3]  *See* WIS. STAT. § 48.415(2)(a).  The County also sought to terminate the parental rights of R.B.'s biological father; however, R.B.'s father was killed in a shooting during the course of the TPR proceeding.

¶4      The circuit court set a trial on the issue of grounds for termination. In October 2023, the court held a pretrial hearing.  J.B. did not appear at this hearing, despite warnings that her failure to appear would result in default.  Based on J.B.'s nonappearance, the court held a default hearing, took evidence, and determined that grounds for termination existed.[4]

¶5      The circuit court proceeded to schedule and hold a dispositional hearing.  During the hearing, the court received a report prepared by the Dane County Department of Human Services recommending termination.  The report summarized the allegations of maltreatment that led to R.B.'s removal from J.B.'s care in 2019, including an incident in which J.B. allegedly assaulted a medical provider and fled, "dragging" R.B. along with her "like a rag doll."  The report also stated, among other things, the following:  J.B. had "experienced periods of

---

[3] Involuntary termination of parental rights cases follow a "two-part statutory procedure."  *Steven V. v. Kelley H.*, 2004 WI 47, ¶24, 271 Wis. 2d 1, 678 N.W.2d 856.  "In the first, or 'grounds' phase," the petitioner must prove that "one or more of the statutorily enumerated grounds for termination of parental rights exist."  *Id.*; WIS. STAT. § 48.31(1).  If the petitioner proves that grounds exist, the court then proceeds to the second, or "dispositional" phase, in which it decides whether it is in the best interests of the child that the parent's rights be terminated.  *Steven V.*, 271 Wis. 2d 1, ¶27; WIS. STAT. § 48.426(2).

[4] *See Evelyn C.R. v. Tykila S.*, 2001 WI 110, ¶24, 246 Wis. 2d 1, 629 N.W.2d 768 (in a TPR case, before entering default judgment against a parent on grounds for termination, the circuit court must take evidence and find by clear and convincing evidence that grounds exist). J.B. does not challenge the circuit court's decision to grant default judgment against her at the grounds phase.

homelessness" and had been "banned" from homeless shelters on multiple occasions for reasons including "verbal and physical attacks" toward R.B. and others; J.B. has an extensive criminal history including numerous battery charges; and J.B. has failed to make progress "in managing her mental health, developing effective coping skills, or utilizing support services consistently."

¶6 During the hearing, the County called witnesses who testified to the following. R.B. was placed with a foster family in January 2020 and has resided with that family continuously since that time. The foster family loves R.B. and has provided for R.B.'s needs. For example, the foster family has been involved in obtaining an individualized education plan for R.B. and ensuring his participation in individual therapy to address mental health concerns. The foster family has another adopted son whom R.B. considers to be a brother. The foster family is willing and able to adopt R.B.

¶7 According to a psychological evaluation, J.B. is diagnosed with post-traumatic stress disorder and borderline personality disorder, and the attachment between J.B. and R.B. is "insecure." J.B. has not successfully managed her mental health issues, causing her to have difficulties prioritizing and meeting R.B.'s needs.

¶8 J.B. has had scheduled visits with R.B. since he was removed from her custody in 2019. J.B. has not consistently attended scheduled visits. For example, out of 28 scheduled visits between May and August 2022, nine were converted to video visits at J.B.'s request, and J.B. failed to attend eleven of the visits at all. J.B. was offered opportunities to increase the frequency of her visits, but J.B. did not take advantage of those opportunities. The missed visits caused

R.B. to experience sadness and confusion, and occasionally to display physical aggression.

¶9 For a short time, J.B.'s visits were "partially supervised," but were returned to full supervision after J.B. took R.B. to unplanned locations and concerns arose that J.B.'s behavior was causing R.B. emotional distress.

¶10 J.B. testified to the following. She and R.B. have a "great relationship" and they read and play together during visits. J.B. has a "stable home" and is "mentally stable." However, R.B.'s relationship with her is "strained because of what we have been through with" child protective services. J.B. has not attended R.B.'s medical or school appointments since he has been placed with the foster family because, as she testified, "I didn't feel like I had a place there."

¶11 In her closing remarks, R.B.'s guardian ad litem ("GAL") recommended termination.[5] The GAL said that R.B. has developed an emotional attachment to his foster family, and that "he could imagine himself living with the [foster family] forever." The GAL also said that, because J.B.'s contact was "inconsistent and unpredictable," R.B. has not been able to get "emotional support" from her, and their "attachment is frayed."

¶12 Applying the statutory best interest factors set forth in WIS. STAT. § 48.426, the circuit court determined that termination was in R.B.'s best interests and issued an order terminating J.B.'s parental rights. J.B. appeals.

---

[5] In this context, a GAL is an attorney appointed by the circuit court to represent a minor child and to "be an advocate for the best interests of a minor child." *See* WIS. STAT. § 767.407(1), (4).

**DISCUSSION**

¶13    J.B.'s sole argument is that the circuit court's decision that termination is in R.B.'s best interests was an erroneous exercise of discretion.[6]

¶14    At the dispositional phase of a TPR proceeding, the circuit court determines whether termination of the parent's parental rights is in the best interests of the child, guided by the best interest factors set forth in WIS. STAT. § 48.426(3).  *See Sheboygan Cnty. DHHS v. Julie A.B.*, 2002 WI 95, ¶¶29, 37, 255 Wis. 2d 170, 648 N.W.2d 402.  These factors are:  (a) the "likelihood of the child's adoption after termination"; (b) the "age and health of the child"; (c) whether the child has "substantial relationships with the parent or other family members," and whether severing those relationships would harm the child; (d) the "wishes of the child"; (e) the "duration of the separation of the parent from the child"; and (f) whether the child can "enter into a more stable and permanent family relationship as a result of the termination."  *See* § 48.426(3).  The court's decision is discretionary and will be affirmed so long as the court "employs a rational thought process based on an examination of the facts and an application of the correct standard of law."  *Julie A.B.*, 255 Wis. 2d 170, ¶43.

¶15    In its oral ruling, the circuit court addressed each of the best interest factors.  The court noted the foster family wished to adopt R.B., and would be able

---

[6] In her appellant's brief, J.B. also asserts that there was "insufficient evidence" to support the circuit court's determination.  However, J.B. fails to develop a clear sufficiency argument, and the County argues that J.B.'s challenge is "more accurately framed as a challenge to the circuit court's exercise of discretion."  J.B. does not respond to this argument in her reply brief, and I deem it conceded.  *See United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (a party's failure to respond may be taken as a concession).

to do so upon termination of J.B.'s parental rights.[7] The court considered R.B.'s age and health, observing that he had endured "a lot of traumas," including the recent death of his father, for his young age. The court acknowledged that R.B. and J.B. love one another, suggesting a substantial relationship between the two, but said that there had not been evidence that J.B. had substantial relationships with J.B.'s family members. The court said that R.B.'s wishes "were articulated through" the GAL, who recommended termination. The court said that R.B. had not "had long separations" from J.B. because there had been "some visits," but also that R.B. had lived with his foster family for four years, which was "almost half of his life."

¶16 The circuit court placed particular emphasis on the factor of whether termination would permit the child to enter into a more stable and permanent family relationship, saying that it took stability "very serious[ly]." The court said that the events leading to R.B.'s removal from J.B.'s care had taken an "emotional toll" on R.B. and that J.B. was not able to provide a stable home. The court said that termination and subsequent adoption would give R.B. the "opportunity to be in that stable place," and that "time is of the essence" due to R.B.'s young age.

¶17 J.B. concedes that the circuit court considered the required best interest factors, but argues that the "weighing was erroneous." J.B. contends "there is a substantial relationship between J.B. and R.B. that would lead to harm in its severance," and this constitutes "overwhelming evidence against granting

---

[7] *See* WIS. STAT. § 48.81(3) (a child may be adopted if "[t]he parental rights of one of the child's parents with respect to the child have been terminated … and the child's other parent is deceased").

termination."[8]      However, even assuming that this factor weighs against termination, the weighing of the factors is for the circuit court, not this court. *See State v. Margaret H.*, 2000 WI 42, ¶29, 234 Wis. 2d 606, 610 N.W.2d 475 (this court "cannot mandate the relative weight to be placed" on any best interest factor).  As noted above, the court appears to have acknowledged that J.B. and R.B. had a substantial relationship, but determined that other factors weighed in favor of termination.  In particular, the court emphasized that stability was crucial for R.B. given his young age and traumatic history, and that termination would permit R.B. to be adopted into a more stable home than J.B. could provide.  J.B. does not argue that the court erred by determining that there was a high "likelihood of adoption" and that adoption would permit R.B. to "enter into a more stable and permanent family relationship."  *See* WIS. STAT. § 48.426(3)(a), (f).  Based on the record and the applicable law, the court was well within its discretion to place heavy weight on these factors and to determine that the best interest factors, on the whole, favored termination.  Accordingly, J.B. has not shown that the court erroneously exercised its discretion.

## CONCLUSION

¶18     For all of these reasons, I affirm the circuit court's order terminating J.B.'s parental rights.

---

[8] J.B. also contends that "positive interactions" between her and R.B. suggest that termination of her parental rights is contrary to R.B.'s wishes.  However, as noted above, the circuit court appeared to determine that the wishes of the child favored termination, presumably based on the GAL's representation that R.B. could "imagine himself living with the [foster family] forever."  J.B. does not argue that the court erred by doing so, nor does J.B. identify any specific material in the record showing that termination was contrary to R.B.'s wishes.  Accordingly, to the extent that J.B. intends to argue that termination would be contrary to the "wishes of the child," *see* WIS. STAT. § 48.426(3)(d), I reject this argument as undeveloped. *State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.